Submitted September 14, affirmed October 12, 1972

CHEATHAM, *Petitioner, v.* JURAS, *Respondent.*

501 P2d 988

Zig I. Zakovics and Reiter, Wall & Bricker, P.C., Portland, for petitioner.

Lee Johnson, Attorney General, John W. Osburn, Solicitor General, and Al J. Laue, Assistant Attorney General, Salem, for respondent.

Before Schwab, Chief Judge, and Langtry and Fort, Judges.

LANGTRY, J.

Petitioner appeals from a final order, dated April 13, 1972, of the Public Welfare Division requiring him to pay $1,089 toward the support of his needy mother for 11 months in 1969. The order was made pursuant to the Relatives' Responsibility Law, ORS ch 416.

The petitioner contends he should be exempt from any support payment under ORS 416.030 (2)(c) which provides that no liability for support shall be imposed

> "* * * if, during the minority of the child, such person [the mother] wilfully deserted or abandoned the child, or, by expulsion or cruelty, drove the child from the parental home * * *."

The evidence received at the administrative hearing showed that the mother and father were divorced in 1958 with the mother gaining custody of petitioner, then aged 15, and his brother, about 12 years younger. In July 1960, after repeatedly trying to get the father to take custody of petitioner and petitioner to go to his father, the mother moved petitioner's personal belongings out of her home and thus effectively excluded him therefrom. He thereafter lived with his father. Within several days the mother, without letting the father or petitioner know of it, placed the younger boy in Albertina Kerr Homes (an adoption and child-caring agency) and voluntarily committed herself to the state hospital on August 12, 1960. When the father located this boy, using private detectives, he took over his care and custody. The mother was out of and back in the hospital until, in 1964, after deterioration of her physical health, she was placed in a nursing home at welfare expense. She had been diagnosed as a multiple sclerosis victim as early as 1952. Her medical record at the hospital soon after she committed herself there in 1960 included the following:

"Chronic Brain Syndrome assoc. w Multiple Sclerosis

"* * * * *

"Mentally, impulsivity * * * difficulty w concentration, lack of critical judgment

"Prognosis: Ultimately poor. Probable slow down hill course w recurring attacks

"* * * * *

"Pt can probably care for self for an indeterminate time, but unable to hold a job for above reasons * * *

"* * * * *

"Multiple Sclerosis w CNS involvment [sic] mildly chronic paranoid orientation"

The key conclusion of the hearing officer, and the only one assigned as error which we think has merit, was:

"The forcing of the relative from the home and the leaving of his younger brother at the Alberta [sic] Kerr Home within days of her entry into a state mental hospital cannot reasonably be considered as an abandonment, desertion or expulsion due to the nature of the recipient's mental condition at the time (Moody vs Voorhies, 91 Advance Sheets 511, 1970) and her apparent inability to take care of her children due to her obvious mental condition (Denny vs Public Welfare Division, 92 Advance Sheets 677, 1971). Under the same reasoning, the relative cannot rely upon being a dependent child under ORS 419.476 (1)."

■ The above portions of the hospital records constitute "reliable, probative and substantial evidence" [ORS 183.480 (7)(d)] that the mother was mentally ill at the time she expelled petitioner from her home.

The Division has argued, based on the statement in *Moody v. Voorhies,* 2 Or App 491, 469 P2d 642, *rev'd* 257 Or 105, 475 P2d 579 (1970):

"* * * The apparent abandonment of the father-son role cannot be held to be a volitional act. The father did not make the choice of being mentally ill," 257 Or at 111,

that inasmuch as the mother was mentally ill or diseased, she was incapable of a volitional act.① The hearing officer also placed reliance upon the *Moody*

---

① ORS 426.340 specifically provides that "mentally diseased" shall be used in lieu of the word "insane." Some treatises continue to index and treat subjects of this nature under the heading "Insane Persons." *See* 44 CJS 5, 6, Insane Persons (1945), and 57 CJS 1049, Mental (1948). Others treat the subject under the heading of "Incompetent Persons." *See* 41 Am Jur 2d 535, Incompetent Persons (1968).

decision. We do not interpret *Moody* as supporting these arguments. In that case the father's confinement in a mental hospital for treatment for most of the year preceding the adoption was the reason he was alleged to have "abandoned" his son. Immediately following the language quoted from *Moody,* above, the court quoted the testimony of a psychiatrist to the effect that the father's hospitalization for mental illness was compulsory and it was the reason for his separation from the child; therefore, the abandonment was not volitional. His hospitalization, not his illness, was the primary reason for abandonment, if any. In the case at bar, the hospitalization came after, not before, the expulsion of petitioner from his home.

■ A person who is or has been mentally ill may or may not be capable of rational action and of looking out for affairs of the nature of those involved here. The question in this regard is one of fact. *See Johnson v. Johnson et al,* 124 Or 480, 484-85, 264 P 842 (1928). We think that is the proper approach in the case at bar.

■ Before considering the fact question, legislative intent should be ascertained. By the terms of ORS 416.030 (2)(c), quoted supra, desertion or abandonment must have been wilful if they are reasons for exempting the child from support. Cruelty on the part of the parent resulting in driving the child away from the home must have been with a bad purpose or wrongful intention on the part of the parent. *Kerr v. Welfare Comm.,* 3 Or App 27, 470 P2d 167 (1970). The word "expulsion" is used in the same phrase with the word "cruelty" in the statute, and can only have been used with the same import. Therefore, we come logically to the conclusion that the expulsion of the child from the

home must have been accompanied with a bad purpose or wrongful intent on the part of the mother if petitioner is to be exempt. Next comes the decisive question, whether the mother was mentally capable of such a purpose or intent. That is the question to be decided upon the evidence. The hospital's diagnosis, shown in its records made about two months after the event, was that the mother had a "chronic brain syndrome," was impulsive, lacked critical judgment, could care for herself only and had a mildly chronic paranoid orientation. The multiple sclerosis which underlay and caused the mental condition had been diagnosed for eight years, and its symptoms were progressive. While we do not agree with the hearing officer's reliance upon *Moody v. Voorhies,* supra, his conclusion, quoted supra, is based upon substantial evidence showing that the mother was unable to care for her children due to her mental condition, which is tantamount to a conclusion that she was incapable of an expulsion of petitioner with a bad purpose, a wrongful intention.

Affirmed.